All right, I think that clears things out. Our third case for this morning is actually a re-argument in Muhammad v. Pearson. So, Mr. Horwitz, we'll hear from you first. Thank you, Your Honor. May it please the Court? The case is not particularly complicated. At the end of the day, the officer simply entered the wrong place. And I think that the best way to illustrate why it is the officers entered the wrong place is to compare the search warrant in this case with other cases. Because it all boils down to the Fourth Amendment protections and the particularity mentioned in the affidavit for the search warrant or the search warrant. So in this case, all that's mentioned relative to the search warrant that the judge was made aware of is one sentence. The sentence is 3236 East 92nd Street, apartment number 1 in Chicago, Illinois. That's what the judge was given. And if we compare that to all the other cases cited by us and by the respondent, the type of detail that's provided in the other cases where there was, let's say, an exception provided for a mistake, which in this case all boils down to the general concept of mistake, errors, an innocent mistake of the officer, that sort of thing. In the United States v. McMillan case, for example, I'm going to read to you what the search warrant said where the court allowed the error. A single-family ranch south side of Darnell Avenue, tan in color, wood material, brick material in lower portion. No, I understand your point that there's a lot of detail. What about Maryland v. Garrison where the search warrant says an apartment at 2036 Park Avenue, third floor, and it turns out that there are two apartments on the third floor of 2036 Park Avenue? So that's a Supreme Court decision. It's a mistake that looks a lot like this one, you know, apartment 1 where there's really 1A and 1B. But the court does not invalidate the warrant there. So, I mean, you can find cases such as the ones you're talking about where there's a lot of detail, but you can certainly find cases where the courts say this is just a mistaken description. The executing officers knew, and there's a contemporaneous record showing the executing officers knew which place to go. So I guess with respect to the latter part of that, I'm with you on the idea that a year and some later, for an officer just to elaborate without limit on what he knew is very troublesome. But we do have the Leeds database search, and we do have the de-confliction submission, which are date-stamped and contemporaneous and all point to 1A. So there's no cases yet that have been decided by any courts that, at least I've seen relative to this briefing, and clearly by this court, where they have stated that information brought, So how do you deal with Garrison then? Well, I apologize, I don't remember the Garrison facts, but there's a plethora of cases. What I just read to you, the Supreme Court uphelds a warrant describing the apartment as 2036 Park Avenue, third floor. And it turns out that's not a singular place. There are two apartments on the third floor at that address. And they actually, as perhaps happened in this case, they end up searching the wrong one. The police end up searching the apartment of the person who's not the target. And the Supreme Court says, you know, this wasn't a very good description, but the error does not invalidate a warrant. They say that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan. So, I mean, it just looks a lot like your case to me. Can I respond to that in my reply? Certainly, absolutely. Because my guess is it's going to turn on the exact language, which was the subject matter. I'd be happy for you to do that, that's fine. But there's so many other Seventh Circuit cases which say that, in essence, another officer would have to look at the warrant in the error cases, where the Seventh Circuit has addressed the error cases. Another officer would have to take the warrant, pick it up, and say he knows which apartment to go into. That's what the Seventh Circuit has said. The Seventh Circuit has stated that there can be no chance that another apartment or another home could be searched. So, in cases where they've allowed it, and predominantly are where, for example, you have a house with a cul-de-sac. It's got a pink door. There's only one house with a cul-de-sac and a pink door. And some officer makes a mistake relative to some minor issue. Let's call it the numbering sequence, the numbering for the address. But there's only one house with a pink door at the end of the cul-de-sac. There's no mistake. Right. No, I understand in that case the fact that the address number might have been typed incorrectly. It's just one fact, and you look at the whole thing, and the pink door may be enough to resolve all doubt. Let me ask you another question. We have the confidential informant looking at the picture of Mr. Carr and saying, yeah, looks like the right person. But are the officers looking for Mr. Carr, or are they looking for the drug dealer? Well, the search warrant affidavit and the search warrant state that Jameson Carr. So what's peculiar about the case is that the officer looked at the photograph and said, I'm looking for Jameson Carr, showed it to the CI. Right. And then he walks in, and then he arrests an African-American young man who he knows is not Jameson Carr. Isn't he in bed? He's lying down when they first see him with the girlfriend. I think he was in the room, yes. But at the end of the day, the relevant component is that he looks at an African-American male, and he already just looked at this photograph of Jameson Carr and showed it to the CI. It's an old photograph, right? I don't think it was that. It's a couple years old. Okay. And so, but at the end of the day, he saw the photograph. And then he brings this man who is not Jameson Carr, a photograph that he saw, down to the police station to only confirm the same thing, which is an example of. I thought they let him loose at the police station because he was demonstrably not an occupant of the apartment, and so they couldn't tie the ammunition to him one way or the other, and so after 15 minutes, out he goes. They let him go because he wasn't Jameson Carr. The arrest warrant was for Jameson Carr. And I guess if the officers have, if there's another exception to entry, and there's a plain view exception, there's probable cause for something else. But at the end of the day, he was not Jameson Carr. They arrested him for Jameson Carr, and that's that. So the same thing they found at the police station for which they brought him down for, for which he was a subject matter of the search warrant, they just totally got the wrong guy, which is exactly the problem with this scenario. So I'll get back to you, Rhonda, relative to what the Supreme Court stated. Sure. But there's too many other Seventh Circuit opinions which have simply stated over and over and over again that particularity is required. But this is not a strict liability regime. I mean, the real question, it's kind of a counterfactual, right, is even though we now know that a mistake was made, or we will assume that a mistake was made, at the time when the police think that 1A is the apartment they're supposed to go into based on this search warrant that says apartment number one, is there a probable cause to do that? Are they reasonable in thinking that this was okay? Because, you know, we're dealing with civil liability at this point. Well, I can tell you there were three police officers who testified in this case, and each police officer said, no, you shouldn't have entered. Each Chicago police officer knew very clearly what the rules were and that they should not have entered. And those are officers Pruszewski, Salazar, and Blessing. And if one looks at docket number 105, it's our additional statement of facts, numbers 18 through 22, we can see that Chicago police officers are very clear. Pruszewski said, no, you need to have the exact address. Salazar stated, must match or don't enter. Blessing stated, not allowed to enter in this case. Those were their words. That's their training because we must consider with clarity what we're dealing with. We're dealing with multi-unit dwelling. Multi-unit dwellings are all over the city of Chicago. Millions of people live in multi-unit dwellings. Now, if an officer doesn't say 1A and 1B, if we look at these cases where the particularity is described with regards to the tone, the color of the brick, the type of roof, the type of driveway, where the numbers are situated in the address, if one looks at that level of particularity, and now we consider people in multi-unit dwellings are now, with all due respect, it's open season. I'm exaggerating that a little bit, but one must consider. Well, I mean, there's some evidence. As I say, there's the Leeds report and there's the deconfliction. I'm setting to one, I mean, there's sort of some strange evidence about, did the CI point to that particular apartment, that side of the building, or did the CI just sort of generally refer to the building? If the CI really did identify, you know, it's the one on the west side, or whichever side it was, I forget, that would be something. But he did not, and that was never presented to the judge. All it was was that apartment. And so if we extrapolate that, where we just look at being a citizen in the city of Chicago in a multi-unit dwelling, many of which are people with not a lot of means, they just happen to be there, and many of them live in apartment 1A, 1B, 1C, 1D, 1E. They're all open season because a police officer can go to a judge and say he pointed to an apartment, just an apartment, and now the officer is off the hook when there's five different places that he can choose. And so I don't think this is where we would want to go for officers as it relates to relations with police officers and citizens. I think people want to be secure in their person, in their home. And obviously the Fourth Amendment is a fundamental right. The notion of their home is their castle is a fundamental right. It's stronger than just about all of them. It's really clear in the Constitution. There are exceptions to it too. Well, sure, but so well established. I don't dispute that the Fourth Amendment is important. Don't worry. So well established. Okay, yeah, I'll let you save a little bit of time for rebuttal if you want. All right, thank you, Judge. Thank you. Yes, Mr. Enriquez. May it please the Court. The District Court properly granted summary judgment in favor of Officer Pearson on plaintiff's claims. Concerning plaintiff's unlawful search claim, Officer Pearson did not violate the Fourth Amendment's warrant clause, and in any event he was entitled to qualified immunity. So here's what really worries me about your side of things. It's what I alluded to with Mr. Horwitz. We have, of course, the complaint for the search warrant, and we have the search warrant. Those seem awfully vague, I guess I will say. And I'm very worried about a regime under which months or possibly years later an officer can say, well, even though it's not in the complaint, I, in my own mind, knew all of these other things too, and I was the executing officer, and so therefore there's no problem. I think the risk of embellishing the background for a warrant is unacceptable in a situation like that. So lots of facts here come in that way. Officer Pearson, for example, in his testimony talks about the CI saying that the pregnant girlfriend lives with Momo and that somebody named Tracy is in the same apartment. These facts are not in the complaint and they're not in the warrant. He could have, you know, the risk is very great that somebody, whether Officer Pearson or another person, could just make these things up. It fails the test of saying you've got to assess these things at the time. Well, I don't know that there is such a rule that says you have to assess things at the time.  And in the complaint for search warrant that was sworn to by Officer Pearson is the statement that he drove the CI to the building where she, quote, pointed to the apartment. The apartment, but it doesn't say whether it's the east or the west apartment. She just said, I'm looking at it right now, it's in the brief, pointed to the apartment at 3236 East 92nd Street and identified it as the apartment where CI met the individual Jameson Carr, a.k.a. Momo. So I don't know how I read that. Even if you've argued it's a singular apartment, okay, fine, it's a singular apartment. I don't know whether it's the east or the west or the first floor or the third floor or whatever else reading that. Well, I wouldn't think that would matter. As long as ultimately the apartment that's searched is the one that she pointed to, however it got to be that way. But we don't know that. I mean, there are cases where it's on the left-hand side of the corridor, but that turns out to depend on whether you take the front or the back stairs. Well, of course, the only way you could ever know that is after the fact and whether or not there's evidence to the effect that that was the apartment that was searched. And, in fact, that was the apartment that was searched, and there's uncontradicted testimony to that effect. But let me go back. Your Honor correctly pointed out that there was a de-confliction submission that was made prior to the search. Right. And in that de-confliction submission, the apartment number listed was 1A, the apartment to be searched. Right. Now, the way it got- I think the Leeds report, too. Right. The way it got that, the reason that 1A was listed is because Officer Pearson learned from the Leeds inquiry that Tracy lived in apartment number 1A. And the reason he knew that Tracy lived in apartment 1A is the testimony that was obtained during discovery in this case that the CI, when he originally met with the CI, told him that the drug sale was made in a specific apartment in that building, the same apartment that he drove her to, that Tracy was a resident of that apartment, that the girlfriend was the pregnant girlfriend. And none of this is in the complaint. Doesn't that strike you as a problem? It does. The issuing judge has no idea of any of these facts, and you're portraying them as good facts. They could have been bad facts, too. Why are we suddenly assessing search warrants on the basis of no information that was before the judge, the issuing person? Well, the judge properly issued the search warrant on the basis of the information on the face of the search warrant. He saw an apartment number, albeit an incorrect- But he issues a defective warrant because it's ambiguous. Well, he issued a warrant that had apartment number 1A on it, 1 on it, that was incorrect. That was absolutely incorrect. So it's a defective warrant. Right, but he also saw the warrant, and in the warrant, the statement about, that you just read a minute ago, about the officer driving the CI to the building and pointing to the apartment was made, and we know how we got to 1A, and we know that the officer was bound, essentially bound, to search 1A, because that was the number that he put on the de-confliction submission, and he got that de-confliction submission from the search of the Leeds database that listed Tracy as living in the apartment, and, of course, he knew that Tracy was a person who lived in the apartment from this conversation that we later learned in discovery in this case. Now, we also learned- Wait a minute. Counsel, I think it would be helpful to know, under your theory, could anybody, any police officer other than Officer Pearson, have executed this warrant lawfully? I think not. Okay. That's troubling, right? I don't think so. He was the one that issued it, and there's lots of cases that we cite in our brief in which the connection that made, in which the conclusion that a warrant was valid was that a specific officer who was involved in pre-search activity knew which apartment there was and was present, either was the executing officer or was present when the execution was made. I frankly share Chief Judge Wood's concern about the after-the-fact explanation. I can imagine another officer, for example, taking this warrant, searching apartment 1B, things go badly for the police there, and a year later in civil litigation, an explanation is provided that says, oh, 1B is the one we really wanted. Frankly, your best evidence is probably the deconfliction, the contemporaneous deconfliction in Leeds reports, but I'm also troubled by the fact that it didn't go to the magistrate. Well, it's certainly very important that there was a deconfliction submission here, but it seems to me that it's... That's the fact that the two men don't look alike. I mean, they're several inches different in height. They're considerably different in age. A 21-year-old doesn't look like a 28-year-old. Right, but they don't argue that that's a problem with respect to the search. What happens is that... I thought they did. I thought they were saying, you know, he looks at the picture of Carr and... Well, if you're drawing a distinction between the search and the arrest, I mean, the arrest is based on, even though you don't look anything like Carr, we're going to arrest you anyway. Well, obviously the officers enter the apartment based on the information that we've talked about now. The moment they enter the apartment, obviously Officer Pearson recognized that there was a potential problem with whether or not the male who was in bed with the pregnant girlfriend... A fact, as I'm saying, is completely... It's not in the deconfliction, it's not in Leeds, it's nowhere. He makes it up later. Right. I mean, he is in bed with a pregnant woman. He didn't make it up later. There's no reason to disbelieve the officer who's testifying under oath to all these things, particularly since among the other facts that he testified to later in discovery in this case is that Tracy was a person in the apartment, and that ultimately was the reason that in the deconfliction submission that was submitted prior to the search, apartment 1A was the apartment listed. That's a validation point. But the whole point of the warrant requirement is to throw some sunshine on police procedures. You know, we could just dispense with it altogether if it wasn't in the Fourth Amendment, and if we wanted to. And some people have said, what's the point? You know, judges all rubber stamp warrants anyway, and I wouldn't accuse them of doing that. But they tend to, you know, expect from the police a decent complaint or affidavit or whatever the jurisdiction wants to call it, supporting the warrant. But the issuing judge has a right to expect that all of the relevant information supporting the warrant is in front of the judge. Something as critical as who is it and what's the number of the apartment unit, I would think is pretty central. Well, the officer, Pearson, acknowledged during discovery in this case that he made a mistake when he put apartment number 1A. If he had put apartment number 1A, we wouldn't be here today. Absolutely. And it's very clear that the correct apartment, the apartment that was searched, was apartment 1A and that he had valid reasons for believing that it was 1A, reasons that track to matters in the record that don't depend on his testimony, including the fact that the de-confliction submission was listed 1A. Can I ask you a question? This is sort of a random question, but I couldn't find this, but are there pictures, photographs of Muhammad and Jameson in this record? Is there any way for us to just look at them? I can't remember whether they are. I couldn't find any, but maybe I didn't look hard enough. I can't remember whether they are. But it's very clear that I think that the problem in this case was that the CI, when shown a picture in the police files, that's what the record says, police files, the police, after learning from the CI that the building in which the drug transaction had occurred, searched their files and found a picture of Jameson Carr from that building, just the building, not listing any apartment number or anything, from the building. He showed it to the CI and said, is this the person? And she said yes. That was very clear, I think, when he also said all these other things that we mentioned, namely that the drug transaction was with not only Mo Mo, but the pregnant girlfriend, that Tracy lived in the building. Then after the search was conducted, Tracy was in the apartment. So was the pregnant girlfriend in bed with Muhammad, whose nickname is Mo. All these things are validating information. But they didn't know his nickname was Mo when they walked in the bedroom. No, but it's uncontradicted from evidence other than that. But that's not knowledge that they're drawing on. No, and to be sure, when Officer Pearson entered the apartment and he saw the male in bed with the pregnant girlfriend, he recognized that there was a problem with the identification. But a reasonable officer in his position would have understood immediately what the problem was and that the problem was that the CI was incorrect when she said that's Mo. So why does that give you even arguable probable cause to arrest the guy? Well, because a reasonable officer would have understood that that was a misidentification by the CI. So you misidentify one person and then everybody else in the universe is subject to arrest? Well, not everybody else was subject to the arrest. The search continued. And they find nothing in the search. The reasonable officer would have allowed the search to continue. The other people were not arrested at all. They were simply detained during the search, which is a lawful thing to do during a valid search. And then they did arrest Muhammad. Now, they had reason to arrest Muhammad on a charge unrelated to the bullets that were found, the ammunition that was found in the apartment. They had a basis to arrest Muhammad on the basis of the CI's statement to Officer Pearson that the drug transaction had occurred in the apartment and the person who was the seller was named Momo and the person who was in the other cell was a- When did they find out Muhammad's nickname is Mo? I don't know whether the record says- So you keep relying on that, but if they don't know that's what his nickname is, then it's not a fact that they're relying on. Well, we know after the fact that that's so and we got- But that's at the moment they're standing there in the bedroom. If you're saying they're not arresting because of the ammunition, they don't- Well, I'm asking you, do they know that his nickname is Mo at that point? Or are they just saying, well, we know drug dealing was happening in this apartment. Let's arrest this guy. I don't know when during the course of the search they learned that it was Mo. We do know through discovery that people other than Officer Pearson acknowledged that Muhammad's nickname is Mo. No, and I understand that, but it can't have been a reason for the arrest if they didn't know it. No, the reason for the arrest was all the other corroborating evidence that supported Officer Pearson's testimony that he had been told by the CI that the person who was the seller was nicknamed Mo, that the other seller was a pregnant girlfriend, that Tracy lived in the apartment, and all those things were corroborated when they actually entered the apartment. There was a Tracy, there was a pregnant girlfriend who was in bed with a male named Muhammad whose nickname later we learn is Mo. All those things are supported. So we know after the fact that the apartment that was searched was the correct apartment, even though it was incorrectly listed on the search warrant. We ask that the court affirm the judgment. All right. Anything further, Mr. Horowitz? That's right. So as to the last statement that they knew it was 1A, Carr family, which was a subject matter of the search warrant, was identified on the bell as 1B. So it is impossible to say and reconcile that issue, and it is impossible to say that therefore they know that it was 1A. Do we know which door the police went through? They went through the front door. I'm sorry. They rammed, I think they rammed through the back door, actually. Is that right? I don't know. Does it make a difference what was on the mailbox or the bell, depending on which door the police entered? The officer states that he performed a significant investigation before engaging in this, before ultimately submitting the information to the court for the F-Day first search warrant. And in performing the investigation, the interesting quality about it is that the object of the investigation is in 1B. So, yes, it should. It's important that. Well, the name in the warrant is the name on the 1B mailbox. Correct. So when one examines all this post hoc information, for example, if we're going to engage in an analysis as to whether that post hoc information is relevant to the inquiry, which I submit it's not relevant at all, it's what goes to the judge, that's what all the cases say, then what's clear is that one cannot say, wait a minute, it's obvious they got the right apartment. It's not obvious they got the right apartment. They got the wrong apartment. They didn't arrest him. They only arrested him temporarily. They got the wrong guy, and that's that. So with regard to Your Honor's question about Maryland v. Garrison, first of all, it's a 1987 Supreme Court case. There's a plethora of Seventh Circuit cases which have construed Garrison meaningfully and have interpreted and explained it. But regardless, in Garrison the distinction is not what I was getting to before, which is the quality of the search warrant, how specific it is. But in that case the court says if the officers knew when they secured the search warrant, if they knew that there was more than one apartment on the third floor, then they must put that information down. In that case they found the officers did not know. So that wouldn't be a search warrant. Is there identifiable information specific enough for another police officer to grab it and enter? Issue. So I just want to, I assume there's no more questions? I don't see any. I just want to leave with the underlying importance of two things. Number one, that one of the things argued by counsel was that it was okay to arrest Marcus Muhammad. The similarity is African-American male. That's it. And that's not okay. We cannot be construing this probable cause to arrest him because he's an African-American male. Or, if we are, then African-American males are going to be in fear if they're in particular units. But that was the argument. Secondly, again, multifamily dwellings, they are at risk if the trial court's decision is upheld because an officer can omit, maybe he knew about the car information on 1B, and we haven't heard about that yet. He can omit that from the trial court, or he can omit other information from the trial court. But the rule is you have the information, then you give it to him. You have the deconfliction. You give it to the judge and let the judge make a decision, and you can't deviate from that because of the fundamental right protections of the Fourth Amendment. Stick to what the judge orders you to do only. And that's the rule. That's what the Seventh Circuit has said. And it's important to make sure that individuals that are living in multi-unit dwellings are not at risk because there's a 1A, 1B, 1C, 1D component to where they live. Thank you. All right. Thanks very much. Thanks to the city as well. We will take the case under advisement. All right. Our fourth case for this morning.